Date signed March 16, 2009




THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

In re:
Gunawan Kuntho Wibisono and
Melania Dessy Pasetyani, Case No. 07-12377

Debtors. Chapter 7

---

Shaman Rimal,

Plaintiff, Adv. Pro. No. 07-486

v.

Gunawan Kuntho Wibisono and
Melania Dessy Pasetyani,

Defendants.

---

**MEMORANDUM OF DECISION**

Before the Court are the Amended Complaint for Non-Dischargeability of Debt Pursuant to 11 U.S.C. § 523 (a)(2) (Docket No. 9) filed by Plaintiff Shaman Rimal ("Rimal"), and the Answer to Amended Complaint (Docket No. 11) filed by Defendants Gunawan Kuntho Wibisono ("Wibisono") and Melania Dessy Pasetyani ("Pasetyani"). The Court conducted a trial

of this adversary proceeding on February 18, 2009. For the reasons set forth in this Memorandum of Decision, the Court will enter an order ruling that Wibisono's undisputed debt to Rimal, in the amount of $106,666.66, is nondischargeable under 11 U.S.C. § 523(a)(2)(A) and will dismiss the complaint against Pasetyani.

## STATEMENT OF FACTS

### A. The Parties

The parties primarily involved in the transaction were Rimal and Wibisono. Their spouses were only tangentially involved.

Rimal emigrated to this country from Nepal. He works as a waiter and, though he has some education in agriculture, he has no background in or understanding of business, accounting or finance.

English is not Rimal's primary language and he speaks it only haltingly. At times his testimony was difficult to follow. At other times it was clear to the Court that he answered a question completely opposite from what he intended: for example, by saying "yes" in response to a question that contradicted his earlier testimony. Nevertheless, the Court was able to understand the substance of his testimony. The Court finds that Rimal was forthcoming in his testimony and was a sincere and highly credible witness despite the limitations on his ability to speak and understand English.

Wibisono also is an immigrant to the United States. At all times relevant to this adversary proceeding he worked as a cable installer. At the time of the transaction that is the subject of this action, he worked for Mid-Atlantic Cable Company ("Mid-Atlantic"). Other than one accounting class, he has very little background in business, accounting or finance. He has no

experience in creating a business and little experience in managing a business. English is his second language also, although he spoke it better than Rimal.

Rimal's wife, Jaya, works as a bank teller and had little involvement in the transaction other than to meet Wibisono when he visited their home. During that visit she heard Wibisono's pitch for the investment that is the subject of this action.

Wibisono's spouse, Melania Dessy Pasetyani, had no material involvement in the transaction.

**B. The Transaction**

In December 2006, Wibisono met with Rimal at Johnny Rockets, a restaurant where Rimal worked as a waiter. The meeting was arranged by a mutual friend. Wibisono presented Rimal with a business plan for Casatelcom Incorporated ("Casatelcom") and asked Rimal to make an investment in Casatelcom.

The business plan described Casatelcom as a Comcast cable installation and repair contractor that would begin operations in January 2006. It stated that the company's goal was to generate $1.2 million of revenues in 2006, and the projections reflected revenue of $1.2 million and net income of $132,596 for 2006.

Wibisono prepared the business plan from software he obtained over the internet. The projections and other financial information he used for the business plan were based on financial information for Mid-Atlantic, which he simply plugged into the software.

Wibisono asked Rimal to invest $1 million. When Rimal told Wibisono he didn't have anywhere near that kind of money to invest, Wibisono asked for $500,000, and then $250,000, as a way of determining what level of investment Rimal could make in the business. At the end of the meeting Rimal was not convinced to make an investment in Casatelcom.

The parties continued their discussion regarding the proposed transaction on several occasions: during at least one telephone call; in a meeting at the Mid-Atlantic offices; at the office of an individual Wibisono identified as a lawyer; and at a meeting at the Rimals' home with Jaya Rimal present. During those discussions, Wibisono spoke glowingly about Casatelcom's business prospects. He said that he had obtained valuable subcontracts that would enable Casatelcom to successfully commence operations immediately. He told Rimal the company would earn $1.2 million in 2006. He tried hard to convince the Rimals to invest in Casatelcom, and became more and more assertive in his efforts to convince Rimal to invest in the company.

In order to induce Rimal to make an investment, Wibisono told Rimal during these discussions that he, Wibisono, also would be investing in Casatelcom. Although Rimal initially testified that Wibisono did not state that he would also invest in Casatelcom, Rimal appeared to have been confused on that point. Rimal later made it clear that Wibisono told him that he, Wibisono, would also invest in Casatelcom.

Wibisono also told Rimal that Casatelcom would hire Rimal as the Finance Treasurer at a salary of $100,000 per year. The salary was to commence April 1, 2006. Wibisono had Casatelcom business cards prepared for Rimal as "Finance Treasurer" of Casatelcom.

The finding that Wibisono made these latter two representations to Rimal – that Wibisono would invest in Casatelcom and that Casatelcom would pay Rimal a salary of $100,000 per year – was corroborated by the Limited Partnership Agreement of Casatelcom Incorporated (the "Partnership Agreement"). The Partnership Agreement was prepared by Wibisono from a form he obtained on the internet. It is a prime example of Wibisono's lack of business knowledge and it appears to have been prepared simply to aid Wibisono in convincing

Rimal to make an investment in Casatelcom. First, according to its title, it is a limited partnership agreement for Casatelcom, a corporation. Obviously corporations are governed by their articles of incorporation and bylaws, and not limited partnership agreements. Second, much of it makes little or no sense. For example, Article I, which is intended to provide the basic agreement to enter into the partnership, provides:

> The Parties agree to execute this agreement and hereby acknowledge for good and valuable consideration receipt thereof [*sic*], it is the intention of the Partners that this Agreement, or as they may be amended [*sic*], shall be the sole Agreement is [*sic*] prohibited or rendered ineffective under the laws [*sic*]. This Agreement shall be considered amended to conform to the Act [*sic*] as set forth in the Codes [*sic*].

Partnership Agreement, Article I. The Partnership Agreement provides that Wibisono was to be the general partner, and Rimal the limited partner. It further provides:

> Each Partner shall contribute to the Partnership certain capital prior to or simultaneously with, the execution of this Agreement. Each Partner shall have made initial capital contributions in the following amounts:

| Name of Partner: | Value of Net Profits: |
|---|---|
| Gunawan K. Wibisono | Eighty (80) percents |
| Shaman Rimal | Twenty (20) percents |

*Id.*, Article II, ¶1. The Partnership Agreement also states:

> 2. SALARIES. “Limited Partner shall receive $100,000/ year paid in biweekly increments for services rendered to the partnership except as specifically and first approved by each of the partners.

*Id.*, Article III, ¶2.

Although Rimal signed the Partnership Agreement, he did not understand it. However, the Partnership Agreement corroborates Rimal’s testimony that Wibisono told Rimal that Wibisono would invest in Casatelcom and that Casatelcom would pay Rimal a salary of $100,000, since Wibisono put those very provisions in the Partnership Agreement.

Ultimately, Rimal agreed to enter into the transaction, which took the form of a loan from Rimal to Casatelcom in the amount of $95,000 (the "Loan"). The Loan was evidenced by a promissory note dated February 18, 2006, payable to Rimal in the face amount of $100,000, at 8% interest. Wibisono prepared the note using a form he obtained on the internet. By the terms of the note and agreement between Rimal and Wibisono, the Loan was going to be repaid in 36 equal monthly installments commencing April 1, 2006.

The Rimals took out a home equity loan to fund the Loan. They funded the Loan with $55,000 on February 18, 2006, $20,000 on March 16, 2006, and $20,000 on March 27, 2006.

**C. The Inevitable Collapse of Casatelcom.**

Wibisono began operating Casatelcom shortly after the Rimals made the loan in February 2006. It did not survive 2006. In addition to the Rimals' loan, Wibisono convinced other investors to contribute a total of about $15,000 of additional funds. Casatelcom's check register (Defendant's Exhibit 14) reveals that Wibisono used the Loan proceeds and these other funds to pay expenses until he burned through the $110,000. Casatelcom ceased paying any meaningful business expenses by August 2006. The total amount of revenue it collected was unclear, but the record established the range was between zero (according to the tax returns) to a maximum of $8500 (according to some internal business records). In any event, its revenue was *de minimis*.

Casatelcom was doomed to fail, and Wibisono knew or should have known that. First, it was woefully undercapitalized. By his own testimony, Wibisono needed at least $300,000 to $500,000 in capital; he initially told Rimal he needed $1 million. He obtained only the Rimal loan, which had to be repaid, and the other lesser amounts described above of approximately $15,000. Thus, from the outset, Casatelcom did not have sufficient cash or capital to survive more than the few months it in fact operated.

Second, Wibisono had neither the experience nor the knowledge to create and manage Casatelcom. The business plan was a flight of fancy based simply on the actual results of Mid-Atlantic, an operating company with substantial experience in the cable installation industry, and it was prepared with little thought or understanding of how a start-up company could achieve Mid-Atlantic's level of success. Further, Wibisono lacked the knowledge and experience to start or manage a business. For example, in an effort to obtain a contract, he bought a BMW SUV (apparently in Casatelcom's name). He testified that he could not remember the details, but he thought it was purchased with a loan from Koons Ford. His purpose in buying it was to let a party from whom he was seeking a contract use the BMW as "collateral" for the contract, even though the BMW itself was subject to a lien. Casatelcom could not make the payments on the BMW and it ultimately was taken back by the lienholder. The entire episode was wasteful, illogical, and dubious.

Third, the contracts Wibisono repeatedly told Rimal he had obtained proved to be of little value, to the extent they existed at all. Wibisono presented three contracts as trial exhibits (Defendant's Exhibits 10, 11 and 12). None of these had been produced at the time of his deposition. Defendant's Exhibits 11 and 12 are not signed by the alleged counter-party to the contract, and no revenue was ever generated from these alleged contracts. A contract with Jade Telecom (Defendant's Exhibit 10) generated approximately $6500 in total revenue, with the first collection of $247 received by Casatelcom in April 2006, and the balance received in June and July 2006. *See* Defendant's Exhibit 14, pp. 2-3.

Casatelcom made the first scheduled loan payment of $3,133.64 to Rimal on April 1, 2006. Casatelcom also made a $1000 payment to Rimal in July 2006, and a $500 payment in August 2006. No other payments were made.

Rimal never received any salary payments from Casatelcom, nor did Wibisono ever contribute any funds to Casatelcom.

**CONCLUSIONS OF LAW**

Rimal contends that his claim against Wibisono should be excepted from discharge pursuant to both Sections 523(a)(2)(A) and (a)(2)(B). The Court concludes that Wibisono made numerous misrepresentations to Rimal in order to obtain the Loan, at least the following of which form the basis for a nondischargeability determination: (1) Wibisono also would invest in Casatelcom; (2) Wibisono had obtained contracts that would enable Casatelcom to successfully begin operations immediately and to earn a substantial profit in its first year; and (3) Casatelcom would pay Rimal a salary of $100,000 to serve as chief financial officer and treasurer. The Court further concludes that the other elements of Sections 523(a)(2)(A) have been met and, therefore, the debt from Wibisono to Rimal should not be discharged. Because of this conclusion, the Court need not address Rimal's claims under Section 523(a)(2)(B). Finally, because there was no evidence in the record that Pasetyani, Wibisono's spouse, had any material involvement in the transactions, made any representations, or even had knowledge of the matter, the Court will dismiss the complaint as to her.

"The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an honest but unfortunate debtor." *Cohen v. De La Cruz*, 523 U.S. 213, 217 (1998). This policy is codified in Section 523, which provides in pertinent part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-
>
> ***
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A). While exceptions to discharge are narrowly interpreted to protect the purpose of providing debtors a fresh start, it is equally important to ensure that "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *Foley & Lardner v. Biondo (In re Biondo),* 180 F.3d 126, 130 (4th Cir. 1999). To prevail on a claim that a debt should be excepted from discharge, a creditor must prove all the elements of Section 523(a)(2) by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991).

**A. Obtaining Money, Property, Services or an Extension, Renewal or Refinancing of Credit.**

Section 523(a)(2) initially requires that the debt be "for money, property, services, or an extension, renewal, or refinancing of credit," and it does not except "simply any debt incurred as a result of fraud but only debts in which the debtor used fraudulent means to obtain money, property, services, or credit." *Nunnery v. Rountree (In re Rountree),* 478 F.3d 215, 219 (4th Cir. 2007). "We hold that the plain language of 11 U.S.C. § 523(a)(2)(A) and the Supreme Court's interpretations of that language require that the debtor must obtain something through fraud for the exception to apply." *Id*. at 223.

Here, this standard is readily met. Wibisiono obtained the Loan from Rimal. Receipt of a loan of money meets the express terms of Section 523(a)(2): " any debt for money…" Further, although the Loan was made to Casatelcom, and not to Wibisono, Wibisono benefitted from the Loan directly as he owned Casatelcom. Moreover, Wibisono has not disputed that he is obligated to Rimal on the Loan. Without objection, Rimal requested the Court to take judicial notice of Wibisono's Schedules F and H, filed at Docket No. 1 in Wibisono's bankruptcy case (No. 07-12377). In Schedule F, Wibisono admits to owing a debt to Rimal in the amount of $106,666.66, and the debt is not listed as contingent, unliquidated or disputed. *See* Docket No. 1 in Case No. 07-12377, p. 22. In Schedule H, Wibisono admits to being a co-debtor on

Casatelcom's obligations, including the obligation to Rimal. *Id*., p. 25. At trial, Wibisono did not dispute that he owes the debt to Rimal.[1]

**B. False Pretenses, False Representation or Actual Fraud.**

If the threshold inquiry is answered affirmatively, namely, that Section 523(a)(2)(A) applies to the subject debt, a plaintiff must still "prove four elements: (1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation." *Biondo*, 180 F.3d at 134**;** *Miller v. Cigna Ins. Co*., 311 B.R. 57, 61 (D. Md. 2004). S*ee also Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 149 (Bankr. D. Md. 1999) (finding that in order to sustain an action under Section 523(a)(2)(A), the plaintiffs must prove: (1) that the debtor made a representation; (2) that at the time the debtor knew the representation was false; (3) that the debtor made the representation with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representation; and (5) that the creditor sustained loss and damage as the proximate result of the representation.); *accord*, *Guaranty Residential Lending, Inc. v. Koep (In re Koep)*, 334 B.R. 364, 371-372 (Bankr. D. Md. 2005). Each of these elements will be addressed in turn.

**1. Misrepresentation**

Rimal must show that Wibisono made a fraudulent misrepresentation. "A misrepresentation can be any words or conduct which produce a false or misleading impression

[1] Wibisono's failure to challenge this point is not particularly surprising. Generally, a corporate officer is not responsible for the contractual debts of a corporation. *See In re Pontier*, 165 B.R. 797, 799 (Bankr. D. Md. 1994). However, a corporate officer "may be held personally liable for his or her own fraudulent conduct committed on behalf of the corporation which causes injury to another." *Id. See also In re Colodner*, 147 B.R. 90, 95 (Bankr. S.D.N.Y. 1992) ("As a 100 percent shareholder of IPM, the debtor had sufficient financial interest in IPM so that the debt owed to the plaintiffs by IPM could qualify as money obtained by the debtor through fraud or false representations for purposes of 11 U.S.C. § 523(a)(2)(A)."); *In re Firestone*, 26 B.R. 706, 714-15 (Bankr. S.D. Fla. 1982).

of fact in the mind of another." *Koep*, 334 B.R. at 372 (citing *Kendrick v. Pleasants (In re Pleasants)*, 231 B.R. 893, 897 (Bankr. E.D. Va. 1999)).

Wibisono made at least three misrepresentations to Rimal: (1) Wibisono also would invest in Casatelcom; (2) Wibisono had obtained contracts that would enable Casatelcom to successfully begin operations immediately and to earn a substantial profit in its first year; and (3) Casatelcom would pay Rimal a salary of $100,000 to serve as its chief financial officer and treasurer. Rimal's testimony that Wibisono made misrepresentations (1) and (2) to Rimal is corroborated by the fact that Wibisono put these provisions in the Limited Partnership Agreement. *See* Findings of Fact, § B. And, of course, Wibisono had business cards prepared for Rimal as "Finance Treasurer" of Casatelcom. Rimal's testimony that Wibisono told him Wibisono had obtained contracts is corroborated by the fact that Wibisono presented the three "contracts" in evidence in an effort to establish that he had, in fact, met this representation.

**2. Intent to Deceive**

Next, a plaintiff must show that the Debtor made the misrepresentation with intent to deceive.[2] "Intent to deceive may be inferred by the circumstances, including whether the defendant knowingly or recklessly made false representations, which she should know would induce the plaintiff to rely on them." *Koep*, 334 B.R. at 372.

> Because direct proof of fraudulent intent is almost impossible to produce, fraudulent intent can be inferred from circumstantial evidence. Additionally, where a person recklessly makes false representations that the person knows or should know will induce another to rely on it, intent to deceive may logically be inferred. However, the recklessness must exceed negligence and rise to the level of reckless disregard for truth.

*Kahler*, 187 B.R. at 513 (internal citations omitted).

---

[2] The intent to deceive is akin to the intent to induce to act, the second required element of fraudulent misrepresentation. *Biondo*, 180 F.3d at 134.

In the course of deciding the appropriate level of reliance required by 11 U.S.C. § 523(a)(2)(A), the Supreme Court pointed out that "the substantive terms in § 523(a)(2)(A) . . . refer to common-law torts . . . ." *Field v. Mans*, 516 U.S. 59, 69 (1995). "The operative terms in § 523 (a)(2)(A) . . . , 'false pretenses, a false representation, or actual fraud,' carry the acquired meaning of terms of art. They are common-law terms, and . . . they imply elements that the common law has defined them to include." *Id*. (citations omitted). "At common law reckless behavior was sufficient to support causes of action sounding in fraud or deceit." *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir.), *cert. denied*, 434 U.S. 875 (1977). In another case, the Seventh Circuit stated: "To prevail on a false pretenses claim [under 11 U.S.C. § 523(a)(2)(A)], the creditor must show that the debtor obtained the money through representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation." *Matter of Sheridan*, 57 F.3d 627, 635 (7th Cir. 1995).

Several other Circuit Courts of Appeal have also acknowledged that recklessness or reckless behavior can satisfy the intent element of a § 523 (a)(2) claim. The Sixth Circuit has stated that "a plaintiff proceeding under section 523(a)(2)(A) must demonstrate that the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172 (6th Cir. 1996) (quotation omitted). The Ninth Circuit Court of Appeals concluded that "reckless conduct could be sufficient to establish fraudulent intent." *Household Credit Services, Inc. v. Ettell (In re Ettell)*, 188 F.3d 1141, 1145 (9th Cir. 1999) (citing *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1286 (9th Cir. 1996) ("reckless disregard for the truth of a representation satisfies the element that the debtor has made an intentionally

false representation”)). And the Fifth Circuit has also acknowledged that recklessness can satisfy the intent requirement under section 523(a)(2)(A): “An intent to deceive may be inferred from reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation.” *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005) (quotations and citation omitted).

Here, Wibisono made the three representations knowing they were false or with such reckless disregard for the truth as to constitute willful misrepresentation. With respect to Wibisono’s representation that he would be investing in Casatelcom, Wibisono knew that he would not do so. Wibisono knew whether he had the financial resources to make a meaningful investment and, in fact, he never did make an investment.

Wibisono also knew that he could not retain Rimal as the chief financial officer and treasurer of Casatelcom at a salary of $100,000 per year, or he made that representation with reckless disregard for the truth. Rimal did not have the experience, education, knowledge or English-language skills to serve in that capacity, and that fact is evident upon listening to him speak and discuss business matters. Further Wibisono knew that Casatelcom did not have the financial resources to pay Rimal $100,000 per year. That amount represented more than 90% of the $110,000 of total funds that were invested in Casatelcom (including the Loan). Within thirty days from the date Rimal made the Loan, Casatelcom would need the resources to begin paying Rimal $8,333 per month in salary and $3,133.64 per month in Loan repayments. This Casatelcom could not do, and it had no chance of doing so at the time Rimal made the Loan. Casatelcom never paid a salary to Rimal, and it made only one scheduled payment on the Loan, in April 2006.

Finally, Wibisono knew, at the time he made the representations to Rimal, that the "contracts" he had obtained would not enable Casatelcom to successfully begin operations immediately and to earn a substantial profit in its first year, or he made those representations with reckless disregard for the truth. Two of the alleged contracts are not even signed by the counter-party and never generated any revenue for Casatelcom. *See* Findings of Fact, § C. The Court does not find that these "contracts" were bona-fide agreements with customers who would pay for Casatelcom's services. The one signed contract generated approximately $6500 in total revenue, with the first collection of $247 received by Casatelcom in April 2006, and the balance received in June and July 2006. No other revenues were generated from that contract. On this record, Wibisono knew, or should have known, that these "contracts" would not enable Casatelcom to successfully begin operations immediately and to earn a substantial profit in its first year.

**3. Causation**

Next, a plaintiff must show that harm resulted as a proximate cause of the misrepresentation. "It is axiomatic that in the context of a claim for exception to discharge under Section 523(a)(2)(A), the harm or damage is the provision of credit." *Biondo*, 180 F.3d at 135. Here, Rimal's testimony established that Wibisono's representations in fact induced him to make the Loan, and that testimony satisfies the causation element of a § 523(a)(2)(A) action.

**4. Reliance**

Finally, a plaintiff must show that he relied on the misrepresentation. In *Field v. Mans*, 516 U.S. 59 (1995), the United States Supreme Court stated that a plaintiff must show justifiable reliance rather than reasonable reliance to prevail under § 523(a)(2)(A). Justifiable reliance does not mean that the plaintiff's "conduct must conform to the standard of the reasonable man.

Justification is a matter of the qualities and characteristics of the particular plaintiff and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 71 (quoting Restatement (Second) of Torts (1976) § 545A, Comment b). "[A] person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation." *Id.* at 70 (internal quotation marks omitted). "[T]he plaintiff is entitled to rely upon representations of fact of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation cannot offer as a defense the plaintiff's failure to make the investigation or examination to verify the same." *Id*. at 72 (quoting 1 F. Harper & F. James, Law of Torts § 7.12, pp. 581-583 (1956)). Nonetheless, a plaintiff is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Mans*, 516 U.S. at 71 (quoting Restatement (Second) of Torts (1976) § 541, Comment a).

Rimal did not blindly enter the transaction without doing any due diligence or making any investigation. Rimal was not convinced Wibisono's proposal was a good investment after the parties' initial meeting at Johnny Rockets. After at least one phone call between the two, Rimal went to Wibisono's office at Mid-Atlantic in an effort to learn about the cable installation business and to see Mid-Atlantic's financial data. There he met with others whom Wibisono said would be involved in Casatelcom. Rimal also went with Wibisono to meet with an individual Wibisono described as a lawyer, who was identified at trial only as "McGuire." McGuire told them that the promissory note must be notarized. Rimal took significant comfort in believing

that a lawyer was involved and providing advice that would protect the investment.[3] Rimal did not agree to make the investment until after Wibisono told him that he (Wibisono) also would be investing in Casatelcom, that Wibisono had obtained contracts and could begin operations immediately, and that Casatelcom would pay Rimal a salary of $100,000. Given Rimal's limited understanding of English, and his near-total lack of business or financial acumen, his reliance on Wibisono's representations was justified.

**CONCLUSION**

For the foregoing reasons the Court finds in favor of Plaintiff, Shaman Rimal, on Count I of the Amended Complaint, and will enter an order ruling that Defendant Wibisono's undisputed debt to Rimal, in the amount of $106,666.66, is nondischargeable under 11 U.S.C. § 523(a)(2)(A). Further, the Court will dismiss the complaint as to Defendant Pasetyani.

**Copies to:**

Shaman Rimal
c/o The Burns Law Firm
6303 Ivy Lane – Suite 102
Greenbelt, MD 20770

John D. Burns, Esq.
6303 Ivy Lane – Suite 102
Greenbelt, MD 20770

Gunawan Kuntho Wibisono
Melania Dessy Pasetyani
11128 Stillwater Ave.
Kensington, MD 20895

---

[3] Other than telling them the promissory note should be notarized, it is not altogether clear what other advice McGuire provided to Rimal or Wibisono, or whether McGuire was, in fact, a lawyer. He clearly did not draft or review the Limited Partnership Agreement, which does not meet the minimum standards of competency of the legal profession, even leaving aside the obvious fact that it is a limited partnership agreement for a corporation. *See* Findings of Fact, § B. Nevertheless, Rimal, with his level of education and lack of sophistication, took great comfort in believing an attorney was involved.

William C. Johnson, Jr., Esq.
1229 15th St. NW
Washington, DC 20005

Chapter 7 Trustee

United States Trustee

**End of Order**